UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NO. 24-7642

_____

MICHELLE J. KINNUCAN,

Plaintiff-Appellant,

v.

NATIONAL SECURITY AGENCY; CENTRAL INTELLIGENCE AGENCY;
DEFENSE INTELLIGENCE AGENCY; and DEPARTMENT OF DEFENSE,

Defendants-Appellees.

_____

On Appeal from United States District Court for
the Western District of Washington, Seattle (No. 2:20-cv-1309 MJP)

_____

**OPENING BRIEF OF
PLAINTIFF-APPELLANT MICHELLE KINNUCAN**

_____

Thomas R. Burke
thomasburke@dwt.com
DAVIS WRIGHT TREMAINE LLP
50 California St., Suite 2300
San Francisco, CA 94111
Telephone: (415) 276-6500
Facsimile: (415) 276-6599

Caesar Kalinowski IV
caesarkalinowski@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

Marietta Catsambas
mariettacatsambas@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

*Counsel for Plaintiff-Appellant Michelle Kinnucan*

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ............................................................. 1

II.  JURISDICTIONAL STATEMENT .............................................. 2

III.  ISSUE PRESENTED ........................................................ 3

IV.  STATEMENT OF THE CASE ................................................. 3

    A.  Factual Background ............................................... 3

        1.  The Attack on the U.S.S. *Liberty* ....................... 3

        2.  The HAC Report ......................................... 6

    B.  Procedural History ............................................... 8

V.  SUMMARY OF ARGUMENT ................................................ 11

VI.  STANDARD OF REVIEW .................................................. 13

VII.  ARGUMENT ............................................................. 14

    A.  Under the Supreme Court and Ninth Circuit's Test, the HAC
    Report Is an Agency Record. ........................................ 14

        1.  *Tax Analysts* established the test for what constitutes an
        "agency record," which applies regardless of the record's
        provenance. .............................................. 15

        2.  All evidence and inferences establish that the HAC
        Report is an agency record under *Tax Analysts* and *Rojas*. ..... 20

        3.  The district court's opinion improperly relieved NSA of
        its burden and created improper inferences. ............... 24

    B.  Even Under the D.C. Circuit's Test, the HAC Report Is an
    Agency Record. ................................................... 29

VIII.  CONCLUSION ........................................................... 38

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. CIA*,
  823 F.3d 655 (D.C. Cir. 2016) ................................................................*passim*

*Bell v. U.S. Dep't of Just.*,
  972 F.2d 1337 (9th Cir. 1992) ..........................................................13

*Ctr. for Investigative Reporting v. U.S. Dep't of Just.*,
  14 F.4th 916 (9th Cir. 2021) ............................................................13

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ............................................................................1

*Forsham v. Harris*,
  445 U.S. 169 (1980) ....................................................................14, 15

*Goland v. CIA*,
  607 F.2d 339 (D.C. Cir. 1978) ....................................18, 30, 31, 32

*Hamdan v. U.S. Dep't of Just.*,
  797 F.3d 759 (9th Cir. 2015) ............................................................13

*Inter-Coop. Exch. v. U.S. Dep't of Com.*,
  36 F.4th 905 (9th Cir. 2022) ............................................................13

*Jud. Watch, Inc. v. U.S. Secret Serv.*,
  726 F.3d 208 (D.C. Cir. 2013) ....................................15, 29, 35, 36

*Kinnucan v. NSA*,
  No. 23-2500 (9th Cir. 2024) ............................................................10

*Kissinger v. Reps. Comm. for Freedom of the Press*,
  445 U.S. 136 (1980) ............................................................................18

*Lindsey v. U.S. Bureau of Prisons*,
  736 F.2d 1462 (11th Cir.), *vacated*, 469 U.S. 1082 (1984) ................15

*Neff Instrument Corp. v. Cohu Elecs., Inc.*,
  269 F.2d 668 (9th Cir. 1959) ............................................................13

*Organic Cannabis Found., LLC v. Comm'r of Internal Revenue*,
  962 F.3d 1082 (9th Cir. 2020) ................................................................4

*Paisley v. CIA*,
  712 F.2d 686, 694 (D.C. Cir. 1983).....................................................33

*Rojas v. FAA*,
  941 F.3d 392 (9th Cir. 2019) .......................................................*passim*

*Tax Analysts v. U.S. Dep't of Just.*,
  845 F.2d 1060 (D.C. Cir. 1988).............................................................15

*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991).................................................................................13

*U.S. Dep't of Just. v. Tax Analysts*,
  492 U.S. 136 (1989)........................................................................*passim*

*United We Stand Am., Inc. v. IRS*,
  359 F.3d 595 (D.C. Cir. 2004).........................................................17, 18

*Wiener v. FBI*,
  943 F.2d 972 (9th Cir. 1991) ...............................................................13

**Statutes**

5 U.S.C. § 552(a)(4)(B) ........................................................................3, 14

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1331 ........................................................................................3

Freedom of Information Act ............................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 56......................................................................................13

Fed. R. Evid. 201 ........................................................................................4

Department of Defense Appropriations for 1969: Hearings Before a Subcommittee
  of the H. Comm. on Appropriations, 90th Cong. (Apr. 8, 1968) .................32, 33

iii

James Scott, *The Spy Ship Left Out in the Cold*, Naval History Magazine, Vol. 31, No. 3 (June 2017)......................................................................5

John Crewdson, *New Revelations in Attack on American Spy Ship*, Chicago Tribune (Oct. 2, 2007) .....................................................................5, 6

Mark A. Stroh, *Attack on the USS* Liberty*: A Stab at the Truth*, U.S. Army War College (Apr. 10, 2009) .................................................................5

Office of Assistant Secretary of Defense (Public Affairs), News Release No. 594-67, Summary of Proceedings (June 28, 1967), U.S. Naval History and Heritage Command, Archives Branch, Immediate Office Files of the Chief of Naval Operations: 1960-1969, Box 913............................................4, 5

*Record of Proceedings, Court of Inquiry to inquire into the circumstances surrounding an armed attack on USS* LIBERTY *(AGTR-5)*...............................4

Secretary of State Dean Rusk, *Executive Sessions of the Senate Foreign Relations Committee together with Joint Sessions with the Senate Armed Services Committee* (Historical Series) 90th Cong. 1st sess., 1967 vol. 19 (US GPO, 2006)........................................................................5

Walter L. Jacobsen, *A Juridical Examination of the Israeli Attack on the U.S.S.* Liberty, 36 Naval L. Rev. 1 (Winter 1986) ...............................................5

William D. Gerhard & Henry W. Millington, *Attack on a Sigint Collector, the U.S.S.* Liberty, National Security Agency, Office of Cryptologic Archives and History (1981).....................................................................*passim*

# I.    INTRODUCTION

On June 8, 1967, Israeli war planes and ships launched an attack on the U.S.S. *Liberty*, a U.S. Navy signals intelligence ship, killing 34 servicemembers and wounding 173 more.  Nearly 60 years later, the motives behind this unprovoked and unjustified assault by a putative U.S. ally remain a secret to the survivors and American public.  Official government records regarding the ambush have largely been withheld from public disclosure, and documents that have been released do not fully explore what happened—leading many to believe the strike was deliberate.

Through the Freedom of Information Act ("FOIA"), Plaintiff-Appellant Michelle Kinnucan—an investigative writer and veteran herself—sought disclosure of an unreleased report in the possession of the National Security Agency ("NSA"). This document, which was originally created by the House Appropriations Committee (the "HAC Report") before its transfer to agency hands, is of great public interest because it was one of the few official inquiries into the incident.  Ignoring that FOIA's "dominant objective" is "disclosure, not secrecy," *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976), however, NSA refuses to produce the HAC Report on the grounds that it is not an "agency record" subject to FOIA.

Despite the fact that NSA admits it obtained and used the HAC Report for its own official purposes—while also providing no evidence that the Committee intended to retain control during the transfer or ever sought its return after being in

NSA's possession for over five decades—the district court granted summary judgment for NSA.[1]  As detailed below, the district court's decision misapplies binding precedent from *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989) and *Rojas v. Federal Aviation Administration*, 941 F.3d 392 (9th Cir. 2019), which affirm that disclosure is required unless the agency can show that it did not lawfully obtain a document or use it for agency purposes.  Instead of applying that criteria, the lower court turned FOIA's burden on its head and relieved NSA of its obligation to overcome the presumption of disclosure, while adopting another circuit's expanded test that incorrectly focuses on the creator's intent.

Because the ruling below, if affirmed, would go against FOIA's stated purpose of government transparency—which is vital to a functioning democracy and government accountability—this Court should reverse the lower court's erroneous holding, clarify the appropriate standard, and affirm that the HAC Report is an agency record subject to disclosure under FOIA.

## II.    JURISDICTIONAL STATEMENT

On September 1, 2020, Ms. Kinnucan sued NSA, the Central Intelligence Agency ("CIA"), and the Department of Defense ("DOD") for declaratory and

---

[1] The district court previously granted summary judgment for NSA on an even more meager record; however, NSA mooted Ms. Kinnucan's first appeal by obtaining a remand so it could purportedly "reprocess" her request. *See infra* at 10.

injunctive relief under FOIA. 3-ER-441–62. The district court had jurisdiction to hear Ms. Kinnucan's claims pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331, and on November 21, 2024, the lower court entered final judgment. 1-ER-19–20. Ms. Kinnucan timely filed a notice of appeal on December 13, 2024. 3-ER-463–66. This Court has jurisdiction under 28 U.S.C. § 1291 over the district court's final decision.

### III. ISSUE PRESENTED

Whether the district court erred in holding that the HAC Report is not an agency record subject to FOIA by misapplying the agency's burden and invoking an incorrect standard.

### IV. STATEMENT OF THE CASE

#### A. Factual Background

##### 1. The Attack on the U.S.S. *Liberty*

Between January and April 1967, the Syrian-Israeli frontier in the Middle East was "the scene of a series of escalating clashes." William D. Gerhard & Henry W. Millington, *Attack on a Sigint Collector, the U.S.S.* Liberty ("*Attack*"), National Security Agency, Office of Cryptologic Archives and History (1981), at 1.[2] These

---

[2] Available at https://www.nsa.gov/portals/75/documents/news-features/declassified-documents/uss-liberty/chronology-events/attack-sigint.pdf. This document was incorporated in Ms. Kinnucan's opening brief, 2-ER-72, and the Court may also take judicial notice of its contents—like any official record, briefing, or materials that are posted on a government website and not subject to

clashes culminated in the Six-Day War between Israel on the one hand, and Egypt, Syria, Lebanon, Jordan, and Iraq on the other. Despite the United States and Israel's longstanding relationship, on June 8, 1967, Israeli jets and naval torpedo boats attacked the U.S.S. *Liberty* in international waters far off Egypt's Sinai Peninsula. The combined air and sea attack killed 34 Americans, wounded 173 more, and severely damaged the vessel.

The complete circumstances surrounding the attack have never been publicly disclosed. A Naval Court of Inquiry ("NCOI") was immediately convened after the attack but adjourned less than a week later, finding that "[a]vailable evidence combines to indicate the attack on LIBERTY on 8 June was in fact a case of mistaken identity." *Record of Proceedings, Court of Inquiry to inquire into the circumstances surrounding an armed attack on USS* LIBERTY *(AGTR-5)*, at 161.[3] However, the Department of Defense's public Summary of Proceedings on June 28, 1967, noted that the NCOI "had insufficient information before it to make a judgment on the reasons for the decision by Israeli aircraft and motor torpedo boats to attack" and "[i]t was not the responsibility of the [NCOI] to rule on the culpability of the attackers[.]" Office of Assistant Secretary of Defense (Public Affairs), News

---

reasonable dispute. *See Organic Cannabis Found., LLC v. Comm'r of Internal Revenue*, 962 F.3d 1082, 1096 (9th Cir. 2020) (citing Fed. R. Evid. 201(b)).

[3] Available at https://www.jag.navy.mil/documents/764/ATTACK_ON_USS_L IBERTY.zip, LIBERTY ATTACK PT 6. *See* Fed. R. Evid. 201.

4

Release No. 594-67, Summary of Proceedings (June 28, 1967), at 1, U.S. Naval History and Heritage Command, Archives Branch, Immediate Office Files of the Chief of Naval Operations: 1960-1969, Box 913.[4]

As a result of still-secret and conflicting information about the incident, many involved maintain that the strike was deliberate. The ship's crew and captain—as well as several U.S. government officials, scholars, and journalists—outright reject the mistaken identity claim. *See, e.g.*, James Scott, *The Spy Ship Left Out in the Cold*, Naval History Magazine, Vol. 31, No. 3 (June 2017);[5] Mark A. Stroh, *Attack on the USS* Liberty*: A Stab at the Truth*, U.S. Army War College (Apr. 10, 2009), at 5-6;[6] Walter L. Jacobsen, *A Juridical Examination of the Israeli Attack on the U.S.S.* Liberty, 36 Naval L. Rev. 1 (Winter 1986). Understandably, public interest in long-hidden reports in government custody has led to significant speculation over the

---

[4] *See also* Secretary of State Dean Rusk, *Executive Sessions of the Senate Foreign Relations Committee together with Joint Sessions with the Senate Armed Services Committee* (Historical Series) 90th Cong. 1st sess., 1967 vol. 19 (US GPO, 2006), available at https://www.documentcloud.org/documents/25879910-28-jun-1967-defense-dept-news-release-on-naval-court-of-inquiry-into-attack-on-uss-liberty/.

[5] Available at https://www.usni.org/magazines/naval-history-magazine/2017/june/spy-ship-left-out-cold.

[6] Available at https://apps.dtic.mil/sti/tr/pdf/ADA499280.pdf.

years that Israel possibly had a nefarious motive.  *See* John Crewdson, *New Revelations in Attack on American Spy Ship*, Chicago Tribune (Oct. 2, 2007).[7]

### 2.    The HAC Report

Following this deadly attack on the U.S.S. *Liberty*, staff for the House Appropriations Committee prepared the two-volume HAC Report,[8] which concerned the circumstances of the attack and errors that may have contributed to the U.S.S. *Liberty*'s failure to withdraw from its location.  *See Attack*, at 59-60.  At some unknown point, the HAC Report was purportedly marked "Top Secret" with a banner stating, "Not for release unless and until authorized by Committee."  *See* 2-ER-176 ¶ 10; 2-ER-140 ¶ 11.

On May 6, 1968, NSA's Eugene "Gene" Yeates[9] requested and received a copy of the HAC Report from the U.S. House of Representatives.  *See* 2-ER-122–23.  On the "Routing and Transmittal Slip" transferring the Report to Yeates, the box for "Note and Return" is unchecked, and the remarks section does not include

---

[7] Available at https://www.chicagotribune.com/2007/108/02/new-revelations-in-attack-on-american-spy-ship-2/.

[8] The full name of the document is *A Report to the Committee on Appropriations — U.S. House of Representatives of the Effectiveness of the Worldwide Communications Systems and Networks of the DoD, U.S.S.* Liberty *Incident*.

[9] Mr. Yeates served over two decades at NSA from 1961 through 1985, including as NSA's Chief for the Office of Legislative Affairs.  *See* 2-ER-72 n.4 (citing https://thelebanontimes.com/a-lifetime-of-dedicated-service-honor-meet-eugene-yeates-2/; https://www.linkedin.com/in/eugene-yeates-3a470a41/).

any reference to returning the documents. *See* 2-ER-122. On May 13, 1968, the HAC Report was then routed from LCDR Edward Koczak to NSA Director Marshall S. Carter.[10]    2-ER-123. The typed portion of the Memorandum for the Director/Deputy Director states:

> The attached is a purloined copy of the House Appropriations Committee report of the effectiveness of DoD communications triggered by the LIBERTY incident. Volume I is of interest, albeit historical, and limits itself to the communications in support of LIBERTY operation. Clipped items may be of interest to you. Volume II is a treatise on DoD communications in general and contains a good summary (pp. i-xix). We recommend you read only this portion at your leisure.

2-ER-123. Director Carter, who "found [the Report] intensely interesting," then apparently sent it on to an unknown recipient with the "recommend[ation]" that it also be read by Rear Admiral Lester Schulz and Colonel Leslie Bolstridge.[11] 2-ER-123.

In 1981, NSA published a classified report written by William Gerhard and Henry Millington, *Attack on a Sigint Collector, the U.S.S.* Liberty, which detailed the attack and the creation of the HAC Report and its contents. *See Attack*, at 59-

---

[10] Following the attack, Director Carter had established an NSA working group, which included LCDR Koczak, "to gather information on the event." *Attack*, at 58.

[11] Adm. Schulz was then serving as the Assistant Director of NSA for the National Cryptologic Staff. *See* 2-ER-73 n.6 (citing https://www.oocities.org/pentagon/quarters/7858/bios/schulzlr.html). Col. Bolstridge was then serving as the Chief of NSA's telecommunications organization. 2-ER-73 n.6 (citing *Attack*, at 59).

60; *see also id.* at 20 n.22, 23 n.39.  Although the report was initially classified, Gerhard and Millington were civilians and actually "worked on this project part time after they had retired."  *See id.* at vii (foreword).  NSA subsequently declassified and released *Attack* to the public in 2006, *id.* at (cover), wherein it crossed out the "Top Secret" designation for the HAC Report in the bibliography, *id.* at 67.

### B.    Procedural History

Ms. Kinnucan is a researcher, journalist, and veteran of the U.S. Armed Forces.  3-ER-228–29 ¶¶ 3-4.  As an honorary member of the U.S.S. *Liberty* Veterans Association, Ms. Kinnucan has long advocated for increased transparency regarding Israel's 1967 attack on the *Liberty*.  *See* 3-ER-229 ¶ 4.  Her work led to the American Legion's 2017 adoption of National Convention Resolution 40, which was subsequently published in U.S. House of Representatives Document 115-91 and "called upon Congress to publicly, impartially, and thoroughly investigate the attack on the USS Liberty and its aftermath" in light of senior U.S. officials' testimony contradicting Israel's official account.  3-ER-229 ¶ 4 (cleaned up).

In February 2019, Ms. Kinnucan submitted a FOIA request to NSA for a copy of the HAC Report.[12]  3-ER-229 ¶ 6; 2-ER-108 ¶ 13; 2-ER-124–32.  Over the next *eighteen* months, Ms. Kinnucan sent *fourteen* follow-up inquiries to NSA seeking

---

[12] Ms. Kinnucan submitted two other FOIA requests, both to NSA and CIA, seeking encrypted traffic reports and unredacted reports involving the U.S.S. *Liberty* attack.  Neither of these requests is at issue in this appeal.

the status of her request, which went unanswered. *See* 3-ER-229–30 ¶ 6. Still, NSA did not produce any documents within the statutory period and did not provide a reason for withholding the records. 3-ER-229–30 ¶ 6. Ms. Kinnucan filed this suit on September 1, 2020, 3-ER-441–62, and NSA finally responded and denied her request on April 19, 2021 on the basis that the HAC Report was not an "agency record[] subject to FOIA," 2-ER-108 ¶ 15; 2-ER-135–36. The denial letter stated that the HAC Report is controlled by the U.S. House of Representatives and that NSA reached out to the committee without response. 2-ER-136. NSA later supplemented its belated denial of Ms. Kinnucan's request with a sworn declaration on April 21, 2021, which claimed that NSA believed that Congress intended to keep the HAC Report under its control because (1) it marked the document "Top Secret" and stamped it "Not for release unless and until authorized by Committee," and (2) it refused to release the Report in response to a separate FOIA request. 3-ER-355 ¶ 3; 3-ER-362–68.

On August 27, 2021, Ms. Kinnucan moved for summary judgment, arguing, in relevant part, that the HAC Report is an agency record subject to FOIA. 2-ER-215–19. NSA subsequently filed a cross-motion for summary judgment, 2-ER-150–72, maintaining its claim that the HAC Report was not an agency record but providing no details regarding the transfer of the Report to NSA's possession, *see* 2-ER-140 ¶¶ 10-11. On December 28, 2021, the district court denied Ms. Kinnucan's

motion and granted the government's motion. Noting that it was a "close question," the court adopted a version of the D.C. Circuit's test for agency records, and found that the HAC Report is not an agency record based on the "not for release" banner. 1-ER-30–31.

Ms. Kinnucan appealed that ruling and submitted an opening brief, which NSA mooted by requesting a "voluntary remand" so that it could reprocess Ms. Kinnucan's request after "government counsel … discovered additional information in NSA's possession" regarding the HAC Report's transfer. *See Kinnucan v. NSA*, No. 23-2500, Dkt. 26 (9th Cir. Mar. 19, 2024); 2-ER-109 ¶ 18. Despite this "re-processing," NSA still later denied Ms. Kinnucan's request on the exact same basis. 2-ER-110–11 ¶¶ 22–24. However, this time, NSA also provided routing information and a memorandum showing the agency's receipt and transfer of the HAC Report. 2-ER-116–23. On August 14, 2024—over five years after Ms. Kinnucan first sent her FOIA request—NSA filed its renewed summary judgment motion, relying solely on the "not for release" banner as support to meet its burden to show congressional intent. *See* 2-ER-98–100; *see also* 2-ER-114 ¶ 34 ("NSA clarifies that NSA does not rely on the Top Secret marking as an indicator of congressional intent[.]"). Ms. Kinnucan then filed her opposition and cross-motion. 1-ER-67–85.

Once again, the district court denied Ms. Kinnucan's request for the records' release and granted NSA's motion for summary judgment. 1-ER-2–18. And once

again, the lower court found that the HAC Report is not an agency record based solely on a lone banner, while applying the D.C. Circuit's test that relies on the creator's intent and shifting the burden on Ms. Kinnucan to disprove such an intent. 1-ER-11–18. This appeal follows.

## V. SUMMARY OF ARGUMENT

The sole issue on appeal is whether the district court erred in ruling that NSA met its burden to establish—as an undisputed matter of fact and law—that the HAC Report is not an agency record subject to disclosure under FOIA. As discussed below, the district court's opinion misapplied the relevant law and placed an improper burden on Ms. Kinnucan. Its judgment should therefore be reversed on multiple independent grounds.

*First*, the Court should hold that the HAC Report is an agency record under FOIA, as established by the Supreme Court and this Court's jurisprudence. In *Tax Analysts*, the Supreme Court affirmed that a document is an agency record when the agency (1) lawfully obtained the document and (2) is in control of the document at the time the FOIA request is made. 492 U.S. at 144-45. The HAC Report easily meets both prongs. It is undisputed that NSA obtained the HAC Report from the Committee and utilized the Report as part of its official duties, including through its dissemination and use of the Report in a number of contexts. Therefore, as this Court already did in *Rojas*, it should re-affirm the Supreme Court's straightforward test in

11

this context—which reflects FOIA's dominant purpose to keep the public informed about government actions—and order the Report's disclosure.

*Second*, even if the Court follows the district court's lead by sidestepping *Rojas* and adopting the D.C. Circuit's test, it should still hold that the HAC Report is an agency record because the only evidence produced by NSA shows that the Committee knowingly released the document to NSA for the agency's use. For even under the D.C. Circuit's test, NSA has failed to meet its burden to provide *any evidence whatsoever* surrounding any limitations on its use of the HAC Report. Instead, NSA improperly seeks to stack unwarranted inference on inference in its own favor, which undermines FOIA's dominant objective of disclosure and effectively relieves it (and all other agencies) of any real burden. Based on this fundamental failure, the Court should hold that the NSA has not met its burden, an agency cannot withhold a document through refusing to provide evidence regarding the document's creation or transfer, and the HAC Report must be released.

In short, regardless of the approach this Court takes, the facts and law affirm that the HAC Report is an agency record subject to disclosure under FOIA. Ms. Kinnucan therefore respectfully requests that the Court reverse the lower court's order granting summary judgment to NSA on this issue and remand this case with orders for the NSA to produce the HAC Report.

## VI.   STANDARD OF REVIEW

This Court reviews FOIA claims *de novo*, "employing the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)," *Ctr. for Investigative Reporting v. U.S. Dep't of Just.*, 14 F.4th 916, 926 (9th Cir. 2021) (citation & internal quotation marks omitted), which requires "the circuit court of appeals [to] give the plaintiff [opposing summary judgment] the benefit of every doubt," *Neff Instrument Corp. v. Cohu Elecs., Inc*., 269 F.2d 668, 674 (9th Cir. 1959) (citation & internal quotation marks omitted).  Beyond Rule 56's requirement, case law affirms that "a FOIA case is unique in that 'only the party opposing disclosure will have access to all the facts,'" *see Bell v. U.S. Dep't of Just*., 972 F.2d 1337, at *1 (9th Cir. 1992) (quoting *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991)), and the law is intended to create a "judicially enforceable right to secure government information from possibly unwilling official hands," *Inter-Coop. Exch. v. U.S. Dep't of Com.*, 36 F.4th 905, 910 (9th Cir. 2022) (quoting *Hamdan v. U.S. Dep't of Just*., 797 F.3d 759, 770 (9th Cir. 2015)).

As such, under FOIA, "the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).  Affirmed by the Supreme Court and Congress long ago, this means that "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency

13

records' or have not been 'improperly' 'withheld.'" *Tax Analysts*, 492 U.S. at 142 n.3 (citing S. Rep. No. 813, 89th Cong., 2nd Sess., 8 (1965) ("Placing the burden of proof upon the agency puts the task of justifying the withholding on the only party able to explain it"); H.R. Rep. No. 1497, 89th Cong., 2d Sess., 9 (1966), U.S. Code Cong. & Admin. News 1966, pp. 2418, 2426 (same)). Where an agency fails to meet its burden, FOIA grants courts the authority "to order the production of any agency records improperly withheld." *Id.* at 142 (quoting § 552(a)(4)(B)).

## VII.  ARGUMENT

### A.  Under the Supreme Court and Ninth Circuit's Test, the HAC Report Is an Agency Record.

While misapplying the proper standard on NSA's evidentiary burden, the district court committed reversible error by adopting and applying an incorrect standard for whether the HAC Report is an "agency record." As the Supreme Court and this Court have made clear, "control" over a record relates to the agency's use of that document—not whether the creator had a subjective intention to limit the document's dissemination. In light of the evidence showing NSA's control through use and dissemination of the HAC Report, the Court should hold that the strong presumption of disclosure has not been overcome and the records must be released.

1. ***Tax Analysts* established the test for what constitutes an "agency record," which applies regardless of the record's provenance.**

Although Congress "did not provide any definition of 'agency records'" in FOIA, *Forsham v. Harris*, 445 U.S. 169, 178 (1980), the Supreme Court has provided guidance for which records must be disclosed. In *Tax Analysts*, the Court held that a document is an agency record if the agency (1) "'either create[d] or obtain[ed]' the requested materials" and (2) is "in control of the requested materials at the time the FOIA request is made." 492 U.S. at 144-45 (quoting *Forsham*, 445 U.S. at 182). As part of this test, the Supreme Court made clear that the inquiry does not "turn on the intent of the creator of a document" because "[s]uch a *mens rea* requirement is nowhere to be found in [FOIA]" and "discerning the intent of the drafters of a document may often prove an elusive endeavor, *particularly if the document was created years earlier*." *Id.* at 147-48 (emphasis added).

Prior to Supreme Court's ruling in *Tax Analysts*, however, the D.C. Circuit adopted a multi-factor test for the second "control" requirement stemming from the Eleventh Circuit, which examined:

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

15

*Tax Analysts v. U.S. Dep't of Just.*, 845 F.2d 1060, 1069 (D.C. Cir. 1988) (quoting *Lindsey v. U.S. Bureau of Prisons*, 736 F.2d 1462, 1465 (11th Cir.), *vacated*, 469 U.S. 1082 (1984)). Although the Supreme Court in *Tax Analysts* rejected consideration of the creator's intent, the D.C. Circuit still later "reaffirmed the four-factor test on several occasions." *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013) (collecting cases).

In *Rojas*, an agency also requested that this Court adopt that four-factor test when examining whether a government employee's putatively personal emails on a government server are under the control of the agency for FOIA purposes. *See* 941 F.3d at 401, 408-09. After examining the history of the D.C. Circuit's test—and noting that the Supreme Court "held that the purpose for which a record is created is not relevant to whether it is controlled by the agency" and "the definition of 'agency records' may not turn 'on the intent of the creator,'" *id.* at 408 (quoting *Tax Analysts*, 492 U.S. at 147)—this Court declined to adopt that test, *see id.* at 409. Instead, it "h[e]ld that a court may consider a range of evidence to determine whether specified records are in the agency's possession in connection with agency-related business." *Id.* Such evidence under the second *Tax Analysts* prong can be gleaned from "the agency's use of documents (including its system for preserving, retrieving, or disposing of the documents, and any reliance on the documents by agency

employees),” even if that use was actually by agency employees “engaging in misconduct.” *Id.*

Here, although the district court affirmed “that *Rojas* and *Tax Analysts* rejected determining ‘control’ based ‘on the intent of the creator,’” 1-ER-11 (citation omitted), and “Kinnucan is correct that [the D.C. Circuit] test does not strictly hew to the Supreme Court’s conclusion in *Tax Analysts*,” 1-ER-12, it still adopted the D.C. Circuit’s standard. In doing so, the court asserted that there are “unique constitutional considerations presented by agency ‘control’ of congressional records,” such as its constitutional oversight of agency functions. 1-ER-11–12 (citing *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 599 (D.C. Cir. 2004)). But the district court’s stance ignores the fundamental premise of FOIA, as well as the basis for the Supreme Court’s rulings on this issue.

Nothing in *Tax Analysts* suggests that the test should be different for records created by congressional committees that are “obtained” by an agency, as opposed to any other entity. Tellingly, the case cited by NSA and the district court involving Congress, *United We Stand*, invokes the incorrect standard but does nothing to advance their argument. That case instead involved documents created by an agency—pursuant to a request by Congress—which were transferred to Congress with markers indicating that they were congressional records that could not be released elsewhere. 359 F.3d at 600-01. Consistent with that limitation, the IRS

affirmed that it "had not *used* these records for any purpose other than to respond to the Joint Committee's April 28, 1997 request,' and that they were *kept* in a Joint Committee correspondence file 'separate from the office's ordinary files.'" *Id*. at 598 (emphasis added) (citation omitted). In other words, it was not the creator's intent that controlled—but rather, the agency's evidence regarding its failure to use or store those documents for its own purposes. Even still, the court held that not all of the files could be withheld, as IRS still "retain[ed] the ability to use and dispose of any portions of its response that would not reveal the Joint Committee's request." *See id.* at 602. Therefore, even when the D.C. Circuit applied its erroneous test that considers the creator's intent, its decision still relied on the agency's use of the documents—as mandated by the Supreme Court.[13]

Supreme Court precedent further contradicts the assertion that "unique … considerations" affect the determination of "control." 1-ER-11. For despite the fact that FOIA's requirements do not apply to the President's office or advisors, *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980), the Court did not rest its decision on that basis or the subjective intent behind the document's creation. Instead, the Court's determination was based on the fact the

---

[13] *See Goland v. CIA*, 607 F.2d 339, 346–47 (D.C. Cir. 1978) ("An agency's possession of a document, standing alone, no more dictates that it is an 'agency record' *than the congressional origins of a document, standing alone, dictate that it is not*.") (emphasis added).

documents "never *entered* the State Department's files, and they were not *used* by the Department for any purpose"—not because of the President's unique role or protections against disclosure. *Id.* at 157 (emphasis added). Likewise, in *Tax Analysts*, which involved judicially created documents, the Court reaffirmed "Congress' desire to put within public reach the information available to an agency in its decision-making processes" through FOIA, 492 U.S. at 144, and that "[t]he legislative history of the FOIA abounds with references to records *acquired* by an agency," *id.* at 144-45 (citation omitted). Therefore, regardless of the original source of the documents—whether private individuals, cabinet members, or federal judges, who are all not subject themselves to FOIA for constitutional and statutory reasons— the Supreme Court affirmed that "control … mean[s] that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Id.* at 145.

By enacting FOIA, "Congress sought to open agency action to the light of public scrutiny.… by requiring agencies to adhere to a general philosophy of full agency disclosure[,]" which "would help ensure an informed citizenry, vital to the functioning of a democratic society." *Id.* at 142 (citations & internal quotation marks omitted). As such, it defies logic that Congress intended to prevent the release of a document transferred to an agency for the agency's official and unfettered use— here, for over five decades—through a simple banner alone. Accordingly, the Court

19

should clarify that the district court was wrong to adopt the D.C. Circuit's test that relied on congressional intent, and should have instead applied the test set forth in *Tax Analysts*, as mandated by this Court in *Rojas*.

>    **2.** **All evidence and inferences establish that the HAC Report is an agency record under *Tax Analysts* and *Rojas*.**

After affirming the correct standard, the Court's *de novo* review should confirm that both prongs of the *Tax Analysts* test are satisfied here, as all evidence produced during summary judgment proceedings establish that NSA obtained and controlled the HAC Report.

Under the **first prong**, although a congressional committee originally created the HAC Report, it is undisputed that NSA lawfully obtained the HAC Report from the Committee in 1968. 2-ER-140 ¶ 10. There is no evidence that NSA obtained the Report illegally, that its possession was inadvertent, or that the transfer was not part of NSA's official duties. As the district court correctly found, the first prong is undeniably met. 1-ER-10 ("The Parties and the Court also agree that because NSA possesses the HAC Report, the only question is whether it 'controls' the document."); 1-ER-29 ("The first element is met here because it is undisputed that NSA has a copy of the report.").

Under the **second prong**, NSA has not met its burden to overcome the strong presumption of disclosure by providing evidence showing that it was *not* in control of the HAC Report and its possession was *not* part of its official duties or in

connection with public business. *Rojas*, 941 F.3d at 408 (citing *Tax Analysts*, 492 U.S. at 145). NSA's only possible evidence supporting its claims are: (1) the Report's banner stating "Not for release unless and until authorized by committee"; and (2) the internal routing slip and memorandum for the Report.[14] Each of these pieces of evidence, whether by inference or explicit reference, establishes that NSA obtained and controlled the HAC Report as part of its official duties.

*First*, the very fact that congressional staff lawfully transferred the Report to NSA reveals that it "authorized" the agency's possession and use, as anticipated by the banner. In other words, that NSA obtained the Report—which could not have been "release[d]" to NSA by the Committee "unless and until authorized"— implicitly reveals that NSA did receive such authorization. Therefore, the "not for release" banner, when combined with NSA's lawful possession and use of that document, weighs entirely *against* any claim that Congress did not in fact "release" the document to NSA. Congress must have authorized the Report for release to NSA for its use, and NSA failed to meet its burden to supply evidence to the contrary. The district court below relied entirely on the existence of this marking on the Report as evidence of congressional control, 1-ER-15, and erred when it failed to grapple

---

[14] The district court correctly found that the "Top Secret" designation was "not material" to the control inquiry, as were the agency's earlier attempts to rely on the committee's "post-hoc objections to disclosure." 1-ER-33; 1-ER-18 ("[T]he present view of Congress is not relevant.").

21

with the argument that the "not for release" banner's admonition is undermined by the Committee's release to NSA.

**Second**, the routing slip and memorandum confirm Ms. Kinnucan's contention that the HAC Report was obtained in furtherance of NSA's official duties. Not only did NSA's employee request the document, it was transmitted to NSA without any notes indicating that it must be returned, and then distributed again multiple times to the NSA Director and others. 2-ER-111 ¶ 24; 2-ER-122–23. NSA has never returned the HAC Report in the 55+ years since it first received those documents, nor provided evidence that Congress (or any of its committees) later demanded its return. And none of NSA's multiple rounds of dissemination reflect any restrictions *by Congress*; and they were all for the apparent purpose of NSA's own consideration and use for decades. Indeed, nothing about these transfers show that the Report was "purely personal," solely for the purpose of assisting Congress, or wholly unconnected to NSA's duties. *See Rojas*, 941 F.3d at 409.

**Third**, NSA's own actions belie its claim that it could not use the HAC Report for its duties or had some implicit restrictions on that use by Congress. To the contrary, the HAC Report was (and likely still is) stored "in the 'Crisis Collection' of the NSA History Collection," *see Attack* at 60, which appears accessible to anyone at NSA and "consists of manuscripts, memoranda, studies, and interviews related

directly or indirectly to the cryptologic history of the United States."[15]  In light of the fact that NSA provided no evidence as "to how [it] maintains the HAC Report and the extent to which it is accessible within the agency," 1-ER-17, the proper inference is therefore that the Report is generally accessible and usable to anyone who visits the Collection for any purpose.

Most tellingly, Ms. Kinnucan presented evidence that NSA has used the HAC Report as part of its official duties since the document's acquisition over five decades earlier.  In creating and distributing *Attack*, NSA allowed two retired civilians to access the HAC Report—who in turn relied on, quoted, and cited portions of it in their report.  *See* 2-ER-183–87.  And when NSA de-classified and publicly disseminated *Attack* in 2006, it apparently believed that it did not need to seek Congress's approval or make any attempt to restrict access to information contained in *Attack* about the HAC Report.  Instead, consistent with the original 1968 release by the Committee at NSA's request and NSA's subsequent distribution, NSA's use (and even declassification) of the HAC Report in *Attack* establish that NSA believed it could use the HAC Report for its own purposes.  *Tax Analysts*, 492 U.S. at 147 ("Agencies generally are not at liberty to alter the content of the materials that they

---

[15] *See* https://www.nsa.gov/portals/75/documents/about/cryptologic-heritage/historical-figures-publications/publications/wwii/pearl_harbor_revisited.pdf, at 85.

receive from outside parties."). As such, the HAC Report is not just physically held at NSA, it was used in connection with the transaction of agency and public-facing business, without any apparent restrictions on NSA's use or further dissemination.

Accordingly, because the undisputed evidence shows that NSA obtained and retained control of the Report for its official purposes, the HAC Report is an agency record under the test explained in *Tax Analysts* and *Rojas*, and the Court should reverse the district court's order and mandate the Report's disclosure.

### 3. The district court's opinion improperly relieved NSA of its burden and created improper inferences.

As an overarching matter, the district court erred when it applied the wrong test to determine whether the NSA met its burden to establish that the HAC Report is not an agency record. But regardless of the test applied, the district court made an initial, fundamental error of law in ruling that NSA had met its burden under the proper standard of review—both under FOIA and Rule 56. The district court essentially shifted the burden of proof by requiring Ms. Kinnucan to categorically *disprove* that the HAC Report is not an agency record—contrary to longstanding Supreme Court precedent affirming that it is "not the requester['s burden] to disprove, that the materials sought are not 'agency records.'" *Tax Analysts*, 492 U.S. at 142 n.3.

In its opinion, the district court acknowledged the correct standard on NSA's burden, 1-ER-8–9 (citing *Tax Analysts*, 492 U.S. at 142 n.3); however, inexplicably,

it consistently ignored NSA's failure to provide evidence to support its assertions and weighed inferences in NSA's favor. While emphasizing the significance of congressional intent under its chosen test, the district court acknowledged that NSA has "provide[d] no declaration from Congress," 1-ER-5, evidentiary support regarding the Committee's historical release of the Report, 1-ER-5–6, or even a copy of the banner that purportedly appears on the HAC Report. Despite that failure, the court credited NSA's speculation that "Congress has never publicly released the HAC Report," 1-ER-13 (citing 2-ER-111–12 ¶¶ 25-27), before affirming that it "*appears* that the Committee placed immediate restrictions on the control of the document" through an alleged banner, 1-ER-13–14 (emphasis added). Unlike the cases cited by the district court, NSA provided *no* evidence regarding how it actually obtained the HAC Report or any contemporaneous instructions from Congress at the time of its transfer regarding limitations on use.

The district court also excused NSA for failing to provide evidence of how it has actually used or stored the HAC Report for over 50 years since it came into possession of the document, which is a key inquiry. In fact, the court expressly acknowledged: "[T]here is no evidence before the Court us [sic] to how NSA maintains the HAC Report and the extent to which it is accessible within the agency." 1-ER-17. It also found that "there is no indication that NSA ever acted in a way contrary to the Congressional banner restricting its public dissemination." 1-

25

ER-17.  But it is NSA's responsibility to provide such evidence—if it exists—and NSA's refusal to turn over that evidence cannot be used in its favor.  Instead, the lack of such evidence in the record weighs against NSA, who bears to burden to overcome the "strong presumption" that the HAC Report is an agency record subject to disclosure.

Beyond relieving NSA of its burden to provide evidence regarding its lack of control, the court also improperly created and weighed inferences in NSA's favor—impermissible under both Rule 56 and FOIA.  Principally, the district court relied on NSA's assertion that the HAC Report possesses a banner stating, "Not for release unless and until authorized by Committee."  *See* 1-ER-15.  In doing so, the court accepted NSA's unsupported speculation about where the banner came from[16] or what it continues to mean, despite the fact that "there is no evidence that NSA was given the HAC Report as a trustee or that the report was limited to Congress' oversight of NSA."  1-ER-15. In effect, the district court ignored all inferences in

---

[16] NSA and the court concede that they are not even sure who placed the banner on the HAC Report, but that "[t]o NSA's current knowledge, the banner was not added by NSA or anyone else after it received the HAC Report."  1-ER-14 (citing 2-ER-111 ¶ 24).

Ms. Kinnucan's favor that the banner's admonition is completely undermined by the Report's lawful release **to NSA by the Committee**. *See supra* at 21.[17]

Moreover, the district court created and stacked a number of impermissible inferences when granting NSA's request for summary judgment, including when it:

- Asserted as established fact that "the HAC Report was never made public, and the report bears a very large banner" despite no evidence of actually showing either, 1-ER-15;

- Acknowledged that the "routing slip" that transferred the HAC Report to NSA control "did not require return of the report" but inferring continued control because that "[t]here is nothing in the routing slip *suggesting* that Congress intended NSA to use the reports broadly or in some manner contrary to the banner," 1-ER-16 (emphasis added); *see also* 1-ER-17 (noting "it may seem peculiar that NSA never returned a copy" but "the Routing Slip itself did not demand return of the document, so NSA cannot be accused of ignoring a return request from Congress");

---

[17] Similarly, just as the second page of *Attack* still asserts that "Contents of this publication should not be reproduced, or further disseminated outside the U.S. Intelligence Community without the permission of the Director, NSA/CSS," that document's declassification and release elsewhere wholly undermines the continued viability of that banner. *See Attack*, at 2.

- Claimed that the "purloined copy" language on a later routing memorandum "*could suggest* the copy sent to Director Carter from Koczak was taken from Yeates without Yeates' permission," 1-ER-16 (emphasis added);

- Decided that NSA's internal distribution, with a note "recommend[ing] limiting reading" to other NSA individuals, "*suggest[s]* that NSA's possession of the HAC Report is not the product of Congress's desire for NSA to use the document freely," 1-ER-16 (emphasis added); *see also* 1-ER-17 (conceding that "the distribution *appears* to have been limited") (emphasis added);

- Inferred the scope of accessibility because "[t]here is nothing before the Court suggesting that [the Report] is widely accessible" within the agency, while acknowledging NSA's distribution to at least five individuals in 1968 and two retired civilians, 1-ER-17; and

- Weighed inferences after asserting that "while the lack of a demand from Congress could also mean the NSA was free to use the Report broadly, the Court cannot reach that conclusion given the fact that the forwarded copy of the Report was festooned with a banner proclaiming Congress' continued ownership," 1-ER-17.

As detailed above, the district court repeatedly erred when it relieved NSA of any burden under FOIA to provide evidence regarding its receipt, use, and continued control and storage of the HAC Report. Furthermore, by weighing all inferences in NSA's favor—despite the well-established standard under summary judgment and Ms. Kinnucan's total inability to counter those inferences by virtue of NSA's control over all relevant documents—it further erred in granting NSA summary judgment on this issue. Because FOIA's strong presumption of disclosure would be eviscerated if agencies were simply allowed to claim that a 50-year-old ambiguous banner on a document alone irrevocably established its status as a congressional record, the Court should reverse the lower court's ruling on this ground as well.

## B. Even Under the D.C. Circuit's Test, the HAC Report Is an Agency Record.

Even if this Circuit wishes to follow the district court's lead and adopt the D.C. Circuit's test for what constitutes an agency's "control" over records, the same result must follow: the HAC Report is an agency record subject to disclosure. Under the D.C. Circuit's expanded test, determining whether a record transferred to an agency has become an "agency record" depends on: "[1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files." *ACLU v. CIA*, 823 F.3d

655, 662 (D.C. Cir. 2016) (quoting *Jud. Watch*, 726 F.3d at 218).[18]  Under the first factor, courts look to "the circumstances of the documents' creation" and "the conditions attending their transfer" to the agency to determine the creator's intent. *Id.* at 664.  For similar reasons as those discussed above, NSA has failed to meet its burden under this test to show that the HAC Report is not an agency record.

    *First*, there is no evidence that the Committee intended to retain control of the HAC Report after it transferred that record to NSA.  As an initial matter, NSA has not met its burden to produce any documents or evidence regarding the creation of the HAC Report.  Unlike the agencies in *Goland* or *ACLU*, NSA supplied no information regarding the process by which the Report was created, or any details from the Report itself to show that the Committee intended this to be for Congress's eyes or use only.

    In *Goland*, for example, the D.C. Circuit found that a copy of a congressional hearing transcript about the CIA's organic statutes, possessed by the CIA, was

---

[18] Although the district court claimed that it applied the test set forth in *ACLU*, *see* 1-ER-11–12, it actually applied a single factor from that test by focusing only on congressional intent.  *See* 1-ER-12 ("To determine congressional intent, the D.C. Circuit requires an analysis of: (1) the facts and circumstances of the documents' creation and (2) the conditions attached to the documents' transfer to the agency.") (citing *ACLU*, 823 F.3d at 661-64); 1-ER-13 ("To determine control under the D.C. Circuit's test, the Court must analyze: (1) the facts and circumstances of the HAC Report's creation and (2) the conditions attending the report's transfer to NSA.").

actually a congressional record because: (1) the House committee met in executive session; (2) the stenographer was sworn to secrecy; (3) the transcript discussed "basic elements of intelligence methodology" and "the CIA's structure and disposition of functions"; (4) the transcript was marked "Secret" when received by the CIA; and (5) most importantly, the CIA retained a copy of the transcript "for internal reference purposes only," evidencing that the CIA held the document as a "'trustee' for Congress." 607 F.2d at 347. Here, *only one* of these five considerations is present—the "Top Secret" marking on the Report, which the court previously found was "not material" to the question of Congress's intent to maintain control. *See* 1-ER-33.

Moreover, although the Report does carry a classification marking, that marking (1) was applied at some unknown time, (2) alone does not evince any intent to control the document beyond those with a proper clearance, and (3) NSA *itself* crossed out the "TS" marking when it declassified and released a document referencing and incorporating material from the HAC Report:

**Investigative Reviews of Liberty Incident**

House Appropriations Committee Surveys and Investigations Staff. *A Report to the Committee on Appropriations - U.S. House of Representatives on the Effectiveness of the Worldwide Communications Systems and Networks of the Department of Defense*, vols. I and II. (TS)

*Attack*, at 67. Therefore, these original external markings carry no weight in the analysis.

31

Next, contrary to the lower court's reliance on NSA's "oversight" argument, the House Appropriations Committee is always acting in an "oversight" role when it deals with agency spending and issues. But Congress's transfer of documents to those agencies cannot be categorically exempt from disclosure. *Rojas*, 941 F.3d at 408 ("the purpose for which a record is created is not relevant to whether it is controlled by the agency"). Here, the substance of the Report was "defense communications systems and naval intelligence practices" related to the attack, 1-ER-31, both of which are related to *agencies* and *their* operations—not their structure or disposition. Most critically, there is no evidence that NSA holds a copy of the HAC Report as a "trustee" for Congress. *Goland*, 607 F.2d at 347 ("The fact that the CIA retains the Transcript solely for internal reference purposes indicates that the document is in no meaningful sense the property of the CIA … but holds the document … as a 'trustee' for Congress."). For this conclusion, the *Goland* court relied on an affidavit testifying that the CIA retained the transcript "for internal reference purposes only." *Id.* Here, NSA provides no similar testimony regarding the creation of the document or any indication by Congress that the HAC Report was given to NSA to hold in trust or for use in connection with Congress alone.

Other evidence supplied by Ms. Kinnucan makes it clear that NSA cannot meet its burden. Indeed, the only evidence adduced regarding the creation of the HAC Report came originally from Ms. Kinnucan's citation to *Attack*. And in *Attack*,

NSA revealed that "the Surveys and Investigations staff [of the House Appropriations Committee] interviewed [the Joint Chiefs of Staff ("JCS")], NSA, Naval Communications Command, Department of Army Communications Center, and JCS Message Center personnel in the Washington area and most of the military commands and communications centers in the Pacific and European regions which had been involved with *Liberty*'s communications in one way or another." *Attack*, at 60. Therefore, unlike other cases where it was clear that the records at issue were strictly created or limited to a small group of people sworn to secrecy, the creation of the HAC Report involved a full staff that surveyed defense department records and spoke with a multitude of defense department members on a topic intended to fix the agency's "pathetic" operations. *See* 1-ER-32 (quoting Department of Defense Appropriations for 1969: Hearings Before a Subcommittee of the H. Comm. on Appropriations, 90th Cong. 357–58 (Apr. 8, 1968)).

The lack of any evidence regarding conditions on the HAC Report's transfer to NSA reinforces that the Report is not a congressional record. *See, e.g.*, *Paisley v. CIA*, 712 F.2d 686, 694 (D.C. Cir. 1983) (affirming no intent to control because "[t]he Government points to no *contemporaneous* and *specific* instructions from [Congress] to the agencies limiting either the use or disclosure of the documents"), *opinion vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984). The "not for release" banner does not evince an intent to never release the Report—just that

copies could not be released to Congress, agencies, or others until initially authorized by the Committee itself. As explained above, the district court was therefore wrong to rely on the "not for release" banner because the HAC Report had, in fact, been released to NSA. *See supra* at 21. NSA's purportedly lawful possession and receipt of the Report affirms that Congress relinquished control of the Report to NSA, who then used it for agency purposes. The district court also drew the counterintuitive inference—advanced by neither party—that the memorandum's use of the word "purloined" "further buttresses the congressional indication of control on the banner itself," despite acknowledging that the HAC Report was obtained lawfully by NSA. 1-ER-14.

Even if this marking did evince a congressional intent, NSA's evidence is still inadequate to meet its burden. In *ACLU*, the D.C. Circuit heavily relied on a *contemporaneous* letter from Congress to the CIA, which stated that the Committee's work product "remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee." 823 F.3d at 665. The nine words stamped on the HAC Report cannot carry as much weight, for time immemorial, as a letter explicitly retaining control over Committee work product.

**Second**, there were no explicit or apparent limitations here on "the ability of [NSA] to use and dispose of the record as it sees fit." *Id.* at 662 (citation & internal

quotation marks omitted). As explained above, the HAC Report was in fact authorized to be released and transferred based on NSA's request. The subsequent transfer of the HAC Report among NSA individuals, use of the document by NSA, and retention in NSA's "History Collection" all weigh against Congress continuing to exert control over the Report. *See id.* (referencing "the extent to which agency personnel have read or relied upon the document" and "the degree to which the document was integrated into the agency's record system or files") (citation & internal quotation marks omitted). For although the HAC Report was originally stamped with "not for release" (it has yet to be revealed when or by whom), NSA did not return the document after it first obtained it. Nor did it limit the dissemination and use to the original requestor (Yeates), or only for "internal" purposes or those related to briefing Congress. Instead, NSA apparently felt it had the authority to de-classify and release certain portions to the public, and it retains possession of the document to this day.

As such, the Court should find that the first and second factors weigh in favor of Ms. Kinnucan, and the document therefore constitutes an agency record that should have been produced. *Id.* at 662 (asserting that "the first two factors of the standard test [are] effectively dispositive") (quoting *Jud. Watch*, 726 F.3d at 221). Otherwise, NSA (and all other agencies like it) would be entirely relieved of any burden to establish that the HAC Report is not an agency record through simply

refusing to produce contextual documents, and documents that originate from Congress would categorically be exempt from disclosure—regardless of whether an agency used them for the bulk of its official business and disseminated within and without the agency.

*Third*, the undisputed evidence shows that "agency personnel have read or relied upon the [HAC Report]," *id.* (quoting *Jud. Watch*, 726 F.3d at 218), further supporting its status as an agency record. After NSA's Chief for the Office of Legislative Affairs requested and received a copy, it was then routed to a member of the NSA working group on the incident, who presumably shared it with the entire group before forwarding it to the NSA Director himself. *See* 2-ER-123 ("*We* recommend you read only this portion at your leisure.") (emphasis added). Director Carter, then apparently sent it on to an unknown recipient with the "recommend[ation]" that it also be read by the Assistant Director of NSA for the National Cryptologic Staff and Chief of NSA's telecommunications organization. Later, it was read and relied upon by Gerhard and Millington for *Attack*—who themselves were already retired—as well as various members of the NSA History and Publications Staff and Cryptologic Records Declassification Staff who helped review and prepare that document. *See Attack*, at ix. Since then, NSA has supplied no information regarding how many individuals have read the Report or used it for

untold numbers of purposes, which is apparently still "located in the 'Crisis Collection' of the NSA History Collection." 1-ER-4; 1-ER-17.

**Fourth**, NSA has provided no information whatsoever regarding "the degree to which the document was integrated into the agency's record system or files," *ACLU*, 823 F.3d at 662 (quoting *Jud. Watch*, 726 F.3d at 218), as is its burden. In light of the fact that it obviously has such information, given that its employee found and "review[ed] … the HAC report," *see* 2-ER-110 ¶ 23, the failure to produce any information results in a heavy inference that the HAC Report is fully integrated into the agency's files. Indeed, without any evidence to the contrary, the Court may presume that each and every current and former employee at NSA—regardless of their job, clearance, or title—can access the HAC Report at their leisure. Given the fact that Gerhard and Millington were retired when they reviewed, relied upon, and related the contents of the HAC Report, such an inference is entirely warranted. This factor also therefore affirms the HAC Report's status as an agency record under NSA's control.

In sum, even under the D.C. Circuit's incorrect test for control that allows courts to consider the creator's intent, NSA has not and cannot meet its heavy burden to show that the HAC Report is not an agency record subject to disclosure under FOIA.

## VIII. CONCLUSION

Ms. Kinnucan—as well as the surviving servicemembers of the U.S.S. *Liberty*, the families of the deceased, and the American public—are all entitled to know what Congress learned nearly sixty years ago about this deadly assault by a putative ally of the United States.  Because NSA has provided no evidence regarding the circumstances of Congress's creation or transfer of the Report to NSA hands, any limitations on NSA's use of the HAC Report, or even congressional intent to retain control over the Report after it was "release[d]" to NSA for the agency's use, it has failed to meet its burden to withhold the document from them and the public. Respectfully, this Court should therefore reverse the district court and order the HAC Report released.

Dated: April 7, 2025

Respectfully submitted,

*/s/ Caesar Kalinowski IV*
Caesar Kalinowski IV
caesarkalinowski@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 622-3150

Thomas R. Burke
thomasburke@dwt.com
DAVIS WRIGHT TREMAINE LLP
50 California St., Suite 2300
San Francisco, CA 94111
Telephone: (415) 276-6500

Marietta Catsambas
mariettacatsambas@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 973-4200

*Counsel for Plaintiff-Appellant
Michelle Kinnucan*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** __24-7642_____

I am the attorney or self-represented party.

**This brief contains _9,033_ words**, **including _43_ words manually counted in any visual images**, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (select only one):

[ **X** ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature _/s/ Caesar Kalinowski IV_____    Date _April 7, 2025_____